IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMPLAINT OF: | ) |
| GATEWAY CLIPPER, INC., as Owner of | ) |
| the M/V Party Liner and Passenger Barge | ) |
| Gateway Party Liner, | ) |
| For Exoneration or Limitation of Liability, | ) |
| Plaintiff, | ) |
| | ) |
| vs | ) Civil Action No. 05-984 |
| | ) |
| RETHA M. HILL, Individually and as | ) |
| Administratrix of the Estate of Howard C. | ) |
| Hill, Jr., | ) |
| Claimant. | ) |

REPORT AND RECOMMENDATION

I. Recommendation:

It is respectfully recommended that the plaintiff's motion for partial summary judgment on its right to limit its liability in accordance with the Limitation of Liability Act and to dismiss the claimant's request for damages of lost future wages (Document No. 48) be denied.

II. Report:

On July 18, 2005, plaintiff Gateway Clipper, Inc., as owner of the M/V Party Liner (the "vessel") and Passenger Barge Gateway Party Liner, filed a complaint for exoneration or limitation of liability arising from an incident on September 4, 2004, when Howard Hill, Jr., a passenger on its vessel, suffered a medical emergency which resulted in his death. This case arises under the Limitation of Liability Act, 46 U.S.C. § 181, et seq. (the "Limitation Act"), now codified at 46 U.S.C. § 30501, et seq., and Rule F of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure. The Court's

jurisdiction is invoked pursuant to 28 U.S.C. § 1333.

On September 4, 2004, Howard Hill was a passenger aboard the plaintiff's vessel, which was chartered for a wedding reception with more than 300 guests. On that date, the vessel departed at 9:05 p.m. from the plaintiff's dock at Station Square in Pittsburgh, PA. Captain Ken Morin was assigned to pilot the vessel, having been licensed by the Coast Guard to pilot it.

Other passengers attending the September 4, 2004 wedding reception were Ann Landay, Janet Hoffman, and Judith Diven, M.D. Ann Landay is certified in CPR and first aid. Janet Hoffman has received training in CPR. Judith Diven, M.D. is a medical doctor who is board certified in psychiatry. Passengers Landay and Hoffman encountered Howard Hill in a stairwell leading to the second deck, at which time he was leaning over a railing, sweating and having difficulty breathing. Landay and Hoffman learned that Mr. Hill could not breathe, and that his asthma inhaler was not working. Landay informed a crew member that Howard Hill was having an asthma attack and requested that help be summoned.

At approximately 11:15 p.m., Chief Mate Edward Breitkreutz was summoned to a second deck landing, where he observed Mr. Hill having trouble breathing. A passenger who knew Mr. Hill informed the Chief Mate that Hill was an asthmatic, who was suffering an asthma attack. Chief Mate Breitkreutz notified the Captain of the medical emergency. The Chief Mate testified that he monitored Mr. Hill's airway, breathing and circulation, but no other first aid or CPR was administered. The Chief Mate acknowledged that Mr. Hill needed more medical assistance than he could provide.

During Mr. Hill's physical distress, passengers Landay and Hoffman asked members of the plaintiff's crew for oxygen several times. Although there was oxygen aboard the

vessel, the plaintiff's employees informed Landay and Hoffman that they had no oxygen, and that it would not help the situation.

The oxygen aboard the vessel at the time was classified as low flow canistered oxygen. In September 2004, the plaintiff's policy with respect to the use of the oxygen was that it was available for use only by trained medical professionals, such as doctors and nurses, and that it could not be administered by the crew. As a result, the plaintiff did not train its employees on how to administer the oxygen aboard its vessel. During Mr. Hill's distress, Judith Diven, M.D. identified herself as a doctor to certain crew members, including Chief Mate Breitkreutz, and she requested oxygen and epinephrine to aid Mr. Hill. Crew members told Dr. Divan that the vessel did not have them. At no time did the plaintiff's employees administer oxygen to Howard Hill.

When Captain Morin was apprised of the medical emergency, he was piloting the vessel downstream on the Ohio River at a rate of approximately 4-5 miles per hour. The vessel was then underway near the McKees Rocks Bridge at approximately Mile 3.5 on the Ohio River. Upon learning of Mr. Hill's physical distress, the Captain proceeded to turn the vessel around, so it could head back upstream. At 11:29 p.m., Captain Morin first called 911. No request for River Rescue is contained in dispatch records of Captain Morin's first call to 911. The Captain then piloted the vessel at full speed -- which was 9-10 miles per hour -- back toward the dock at Station Square.

At approximately 11:35 p.m., Captain Morin made a second call to 911, at which time he requested assistance from River Rescue. On September 4, 2004, River Rescue was not staffed during the 11:00 p.m.- 7:00 a.m. shift, a fact which the plaintiff and Captain Morin were

not aware.  When River Rescue is not staffed after 11:00 p.m., it has two EMT divers who are

dispersed among land-based medic units.  If River Rescue assistance is requested after 11:00

p.m., EMT divers must be contacted to report to the River Rescue boathouse.  According to

River Rescue's Operations Chief, when a vessel contacts 911 after 11:00 p.m. and states it is less

than ten minutes from its dock, there is no point in dispatching River Rescue, as the vessel would

be at its dock by the time River Rescue reached it.  Here, the vessel docked at Station Square at

approximately 11:45 p.m., about ten minutes after Captain Morin made his second call to 911.

   When Captain Morin learned of Mr. Hill's emergency and turned the vessel

around, there were several closer landings where he could have docked the vessel than at Station

Square.  The vessel's Safety Contingency Plan lists 14 accessible landings in the event of

onboard emergencies, including locations at Duquesne Light Co. Ferry Crossing, Heinz Field and

Peg's Marina, all of which were in closer proximity to Mile 3.5 on the Ohio River than is the

plaintiff's dock at Station Square.  On September 4, 2004, the plaintiff knew that the landings at

Duquesne Light Co. Ferry Crossing, Peg's Marina and Heinz Field were accessible to the vessel

during a medical emergency; however, prior to Mr. Hill's death, it never provided its captains

with the list of accessible landings from its Safety Contingency Plan, and it never provided

training to them on accessible landings which were available in the event of an emergency.

Thus, while Captain Morin was familiar with the landing at Duquesne Light Co. Ferry Crossing,

he would not consider evacuating a passenger there in an emergency.

   When the vessel docked at Station Square, paramedics were waiting, having been

summoned by the Captain's call to 911, and they boarded the vessel.  A doctor on service to the

City of Pittsburgh, Brian Suffoletto, M.D., also responded to the call.  When the doctor arrived

on the scene, Mr. Hill was conscious, but he could not walk or stand on his own.  Mr. Hill

subsequently lost consciousness, and Dr. Suffoletto intubated him on the dock.  Mr. Hill was

then transported to Mercy Hospital, where he died on September 8, 2004.[1]

        In its complaint for exoneration or limitation of liability, the plaintiff contends

that the approximate value of its interest in the M/V Party Liner and Passenger Barge Gateway

Party Liner after September 4, 2004 was $400,000 and $1,600,000 respectively, for a combined

value of $2,000,000.  This is corroborated in a verification of value submitted by Henry Gusky,

the plaintiff's Assistant Vice President and Assistant Secretary.[2]  Henry Gusky also submitted a

verification of pending freight, wherein he avers that following the incident of September 4,

2004, the plaintiff had $0.00 interest in the pending freight of the two vessels.[3]  In light of the

plaintiff's verifications, the Court entered an Order dated September 12, 2005, granting the

plaintiff's Motion for Approval of Ad Interim Stipulation for Value and Costs and Letters of

Undertaking in the collective amount of $2,000,000, together with interest and court costs as

security for purposes of this action.

        On November 3, 2005, claimant Retha M. Hill, individually and as

administratrix of the Estate of Howard Hill, Jr. filed a claim for personal injuries against the

plaintiff.  The claimant contends that the fatal injuries suffered by Howard Hill were caused by

the negligence of the plaintiff in its own right, and/or through its vessel and crew, in: (a) failing

---

1.    See, plaintiff's statement of material facts at ¶¶ 29-36, 38-51, and the claimant's response
thereto.  Also see, claimant's additional material facts at ¶¶ 65-68, 70-73, 86-95, 102, 112-117,
144-147, 156-166, and the plaintiff's response thereto.

2.    See, Exhibit A to the complaint.

3.    See, Exhibit B to the complaint.

to provide appropriate medical treatment or care for Mr. Hill's condition; (b) failing to properly train its crew members to respond to medical emergencies; and (c) failing to put Mr. Hill ashore in a timely manner so he could receive prompt medical care, as well as other complained-of acts.

The claimant asserts that the plaintiff had privity or knowledge of its aforesaid negligent acts, and/or those of its vessel and crew.  As personal representative of Howard Hill, Jr., and as representative of the decedent's heirs, the claimant seeks compensatory damages under the general maritime common law for Wrongful Death.  She also seeks damages for pain and suffering, the cost of medical and hospital care, the loss of Mr. Hill's future earnings, and all benefits under the Pennsylvania Survival Act, 42 Pa.C.S. § 8302.

Discovery has ended, and the plaintiff has moved for partial summary judgment on two issues: (1) the limitation of its liability; and (2) the claimant's request for damages of Mr. Hill's future lost wages.  According to the plaintiff, its liability, if any, should be limited to the value of its limitation fund, as all claims of managerial negligence relating to its alleged failure to provide adequate medical care lack merit.  With respect to the claimant's demand for future lost wages pursuant to the Pennsylvania Survival Act and Wrongful Death Act, the plaintiff insists such damage claims should be dismissed, as they are not available under general maritime law.

Summary judgment is appropriate if no genuine issue of material fact is in dispute, and the movant is entitled to judgment as a matter of law.  F.R.Civ.P. 56(c); Biener v. Calio, 361 F.3d 206, 210 (3d Cir. 2004).  For reasons discussed below, the plaintiff's motion for partial summary judgment should be denied.

Is the plaintiff entitled to limit its liability as a matter of law?

Under the Limitation Act, a vessel owner is allowed "to limit liability for damage

6

or injury, occasioned without the owner's privity or knowledge, to the value of the vessel or the owner's interest in the vessel." Lewis v. Lewis & Clark Marine, Inc., 531 U.S. 438, 446 (2001), citing 46 U.S.C. § 183(a), now codified at 46 U.S.C. § 30505.   To determine if a shipowner is entitled to limit its liability, we engage in a two-step analysis as follows: first, we decide if negligence or unseaworthiness caused Mr. Hill's death, an issue on which the claimant bears the burden of proof.  Second, if the claimant shows that there was negligence, we must ascertain if it was without the knowledge or privity of the plaintiff, for which the plaintiff bears the burden of proof.  See, Complaint of Consolidation Coal Co., 123 F.3d 126, 132 (3d Cir. 1997), cert. denied, 523 U.S. 1054 (1998), citing Bankers Trust Co. v. Bethlehem Steel Corp., 761 F.2d 943, 948 n.14 (3d Cir. 1985).

It is clear that "a shipowner owes the duty of exercising reasonable care towards those lawfully aboard the vessel". Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 630 (1959).  "[G]eneral maritime law has recognized the tort of negligence for more than a century"; and "breaches of a maritime duty are actionable when they cause death, as when they cause injury." Norfolk Shipbuilding & Drydock Corp. v. Garris, 532 U.S. 811, 820 (2001).

The claimant asserts that the plaintiff violated its duty of care to Howard Hill in these ways: by failing to adequately train its captains, including Captain Morin, on the accessible emergency landings available to the vessel during a medical emergency; by failing to implement its federally-mandated Shipboard Safety Contingency Plan and failing to adequately train its captains in such Plan; by failing to adequately train its crew in medical emergency drills, as well as in administering oxygen which was aboard its vessel on September 4, 2004; and by failing to train its captains in the shifts and seasons during which River Rescue is staffed.

"Although a carrier has no duty to furnish a doctor for its passengers' use, it does owe its sick and injured passengers a duty to exercise reasonable care to furnish such aid and assistance as ordinarily prudent persons would render under similar circumstances." Barbetta v. S/S Bermuda Star, 848 F.2d 1364, 1371 (5th Cir. 1988).  When a vessel provides no physicians or nurses, as here, "the carrier is under a duty to provide such care and attention as is reasonable and practicable under the circumstances, and this has traditionally required the master to change course and put it in the nearest port, according to the gravity of the illness." Nietes v. American President Lines, Ltd., 188 F.Supp. 219, 221 (D.Cal. 1959).

Here, the claimant has submitted the expert reports of Captain Mitchell Stoller and Captain James Jamison, both of whom opine that Captain Morin failed to evacuate Mr. Hill from the vessel by the most expeditious route, as at least three other docks were available which provided closer evacuation points to the vessel's turnaround location.[4]  The record shows that the plaintiff's dock at Station Square was approximately four miles upriver from the location where Captain Morin learned of Mr. Hill's medical emergency, whereas the dock at Duquesne Light Co. Ferry Crossing was approximately one mile from the turnaround location, and docks at Heinz Field and Peg's Marina also provided closer evacuation points.[5]

As previously discussed, the plaintiff never provided information to Captain Morin about other commercial docks that might be available to the vessel in an emergency, although it was aware of such alternate landings and listed them in the vessel's Safety

---

4.    See, Stoller report at pp. 2, 5 (Exhibit 10 to claimant's appendix), and Jamison report at p. 2 (Exhibit 11 to claimant's appendix).

5.    Id.

Contingency Plan.[6]  Still, Captain Morin was familiar with the alternate landings at Duquesne Light Co. Ferry Crossing, Peg's Marina, and Heinz Field.

With respect to the landing at Duquesne Light Co. Ferry Crossing, Captain Morin acknowledged it was a little more than a mile from where he learned of Mr. Hill's emergency while piloting the vessel.[7]  On that evening, however, Captain Morin was unsure if it was physically possible for the vessel to dock at Duquesne Light Co. Ferry Crossing.[8]  That is because the plaintiff never advised him that the Coast Guard had determined that Duquesne Light Co. Ferry Crossing was an accessible landing for the vessel, and the plaintiff never trained him, nor allowed him to test to see if he could dock the vessel there.[9]  Consequently, on the night of Mr. Hill's emergency, Captain Morin did not consider utilizing Duquesne Light Co. Ferry Crossing as a possible landing site.[10]

It is the opinion of Captain Stoller that:

[Plaintiff] Gateway Clipper should have researched and identified potential, alternative evacuation points and then developed communication policies to contact those docks to secure permission to dock and allow access to shoreside emergency medical service.  Gateway Clipper then should have trained its captains -- *before* medical evacuation was necessary -- on which docks offered alternative evacuation points.  Capt. Morin -- a captain who often transited the areas -- should have been made familiar with optional,

---

6.    See, Stoller report at pp. 5-6 (with citations to the record therein).

7.    See, 11/1/2006 deposition of Ken Morin at pp. 34-35.

8.    Id. at p. 36.

9.    Id. at pp. 38, 58-59.

10.    Id. at p. 38.

local docks that could be available for medical emergencies.
(Emphasis in original).[11]

Captain Stoller also opines that the plaintiff's officers and crew had "inadequate skills, training,

authorization and knowledge to administer the available oxygen" on the vessel.[12]  According to

Captain Stoller:

> It does little good to equip a vessel with traditional emergency
> equipment such as oxygen and then fail to train the crew on
> when and how to use the equipment.  Gateway Clipper's
> managers failed in their non-delegable duty to train their crew.
> Gateway Clipper's failures unnecessarily delayed Mr. Hill's
> access to oxygen.[13]

The claimant's medical expert, Ian Greenwald, M.D. FACEP, concurs that "had

Mr. Hill received prompt medical attention the asthma exacerbation would have not resulted in

him sustaining a life-ending anoxic brain injury."[14]  Dr. Greenwald opines:

> It is with reasonable medical certainty that the delay in medical
> care associated with the decision to not go to the closest dock
> or rendezvous with River Rescue cost Mr. Hill his life.  With
> prompt and appropriate medical care available like that in the
> City of Pittsburgh, an otherwise healthy 34-year old male like
> Mr. Hill should not die from an asthmatic attack... Additionally,
> the decision to not provide oxygen to Mr. Hill contributed to
> the unrecoverable anoxic brain injury and death.[15]

The record also shows that by November 2003 or earlier, the plaintiff knew it was

---

11.   See, Stoller report at p. 7.

12.   Id. at p. 11.

13.   Id.

14.   See, Greenwald report at p. 2 (Exhibit 12 to claimant's appendix).

15.   Id. at p. 4.

required by federal law to have a safety/hazard assessment and Safety Contingency Plan for the vessel.[16]   The plaintiff was required to demonstrate the effectiveness of its Safety Contingency Plan to the U.S. Coast Guard by December 1, 2004.   However, as of November 1, 2006, the Coast Guard had not issued written confirmation that the plaintiff had demonstrated the effectiveness of its Safety Contingency Plan.[17]   It is the opinion of Captain Stoller that the plaintiff's failure to implement and update its Safety Contingency Plan left Captain Morin untrained and unprepared to react appropriately to Mr. Hill's medical emergency.[18]   According to Captain Stoller,

> A preplanned contingency plan would have allowed
> Gateway Clipper's managers to train their crews to use
> oxygen and to prepare their captains for expeditious
> medical evacuations.[19]

In order to incur liability, a shipowner's negligence must be a contributing and proximate cause of the accident.  Hercules Carriers, Inc. v. Claimant State of Florida, D.O.T., 768 F.2d 1558, 1566 (11th Cir. 1985).  A shipowner's failure to provide adequate training for its crew can demonstrate its negligence.  Id. at 1566-1575; In Matter of Complaint of Warrior & Gulf Navigation Co., 1996 WL 904752, *9 (S.D.Ala., Nov. 13, 1996) (shipowner's failure to provide meaningful training contributed to crew's negligence); accord, In Matter of Complaint of Theriot Crew Boats, Inc., 1996 WL 495154, *2 (E.D.La., Aug. 29, 1996).  Here, based on the

---

16.   See, claimant's material fact at ¶ 134, and the plaintiff's response thereto.

17.   Id. at ¶ 138.

18.   See, Stoller Report at p. 9.

19.   Id.

record recited above, the claimant has met her burden of proof on the issue of the plaintiff's liability.

At this juncture, to obtain a limitation of liability, the plaintiff must "demonstrate a lack of privity and knowledge". Complaint of Consolidation Coal Co., supra, 123 F.3d at 132, citing Bankers Trust Co., supra, 761 F.2d at 948 n.14. The Third Circuit Court of Appeals has explained that a corporate shipowner is "held liable for the acts or knowledge of managing officers or supervisory employees", but it generally will "not be held liable for the actions of crew members in the navigation or operation of the ship at sea." Bankers Trust Co., 761 F.2d at 952. Thus, in cases involving a corporate-owned vessel, as here, "privity and knowledge scrutiny focuses on whether the shore-based high-level management was aware or should have been aware of the likelihood of the occurrence before the ship's departure." Id.

Based on testimony of the plaintiff's Safety and Security Manager, Nate Brown, and its Director of Fleet Operations, Dan Lacek -- two of the plaintiff's highest ranking safety officials -- the record reflects that one or both of them knew, or should have known that prior to September 4, 2004, medical emergencies requiring immediate oxygen and medical treatment occur on the plaintiff's vessels, and that passengers with severe breathing difficulties need oxygen and immediate medical care; that despite having oxygen aboard its vessels since at least 1991, the plaintiff failed to train its crew in administering the oxygen prior to September 4, 2004; that before Mr. Hill's death, the plaintiff provided no formal training to the vessel's captains or crew on accessible landings which were available to them during emergencies; that before September 4, 2004, the plaintiff never provided its captains with the list of landings from its draft Safety Contingency Plan that it concedes are accessible to the vessel during a medical

emergency; that the plaintiff never reviewed the vessel's Safety Contingency Plan to determine

if it needed to be updated, or if parts of it were ineffective; and that Captain Morin was never

trained by the plaintiff in accessible landings available to the vessel in an emergency, such that he

would not consider evacuating a passenger at the landing at Duquesne Light Co. Ferry Crossing

during a medical emergency.[20]

        Negligent acts which contribute to an accident are "directly attributable" to a

shipowner that fails to exercise due diligence in selecting, training or maintaining a competent

crew.  Hercules Carriers, 768 F.2d at 1576-77.  When a shipowner knows or should have

known that its captain was improperly trained, it is deemed to have privity and knowledge.

Trico Marine Assets, Inc. v. Diamond B Marine Services, Inc., 332 F.3d 779, 790 (5th Cir.

2003); In Matter of Theriot Crew Boats, Inc., supra, 1996 WL 495154, *2 (failure to properly

train crew defeats a shipowner's right to limit its liability); accord, In Matter of Complaint of

Warrior & Gulf Navigation Co., supra, 1996 WL 90452, at *10.

        Here, the plaintiff has failed to show that it lacked privity or knowledge

concerning the complained-of acts of negligence which may have contributed to Mr. Hill's

death.  Thus, it is not entitled to a limitation of liability.

Does federal maritime law foreclose the claimant's request for damages of lost future wages?

        The plaintiff argues that future lost wages and other damages sought under

Pennsylvania's wrongful death and survivor statutes are not available under general maritime

law.  The plaintiff is mistaken.

_____

20.   See, claimant's material facts at ¶¶ 99, 101-103, 146-148, and 159, and the plaintiff's
response thereto.

In cases as here, which arise under admiralty jurisdiction, a party's liability is governed by substantive admiralty law, while damages may be sought under a state wrongful death or survivor statute. Yamaha Motor Corp. v. Calhoun, 516 U.S. 199, 202, 206 (1996). Indeed, a party "may assert a cause of action based upon a state wrongful death or survival statute to obtain relief for the death of a non-seaman killed in United States territorial waters". Calhoun v. Yamaha Motor Corp., U.S.A., 216 F.3d 338, 340 (3d Cir. 2000), cert denied, 531 U.S. 1037 (2000), rehearing denied, 531 U.S. 1105 (2001), citing Yamaha Motor Corp., supra, 516 U.S. at 216.[21]

The plaintiff does not dispute that Pennsylvania law permits recovery for lost future income in a survival action.[22] The claimant points out that Ohio law also allows for recovery of lost future income in a survival action.[23] Pennsylvania is where the incident occurred, where Mr. Hill voluntarily traveled to participate in the wedding reception, and where the plaintiff is domiciled. Ohio is where Mr. Hill was domiciled, where the claimant is domiciled, and where Mr. Hill's estate is being administered. Since the parties have not raised a choice of law conflict, we need not engage in such an analysis. Regardless of whether

---

21.   The plaintiff questions whether the Court's above holding in Yamaha Motor Corp. is applicable to the commercial maritime industry, as the accident in that case occurred on a jet ski pleasure craft that is mostly used for recreational purposes. 516 U.S. at 201-02. However, in Yamaha Motor Corp., the Court did not limit its holding to recreational accidents at sea. Rather, the Court broadly stated that "Congress has not prescribed remedies for the wrongful deaths of nonseafarers in territorial waters", such that "we preserve the application of state [wrongful death and survival] statutes to deaths within territorial waters." Id. at 215-16.

22.   See, plaintiff's memorandum of law in support of its present motion at p. 20.

23.   See, claimant's memorandum of law opposing the present motion at p. 22, citing Ohio Revised Code §§ 2125.02 (B)(1) and (B)(4).

Pennsylvania or Ohio law is applied, damages for lost future income may be recovered.

Therefore, it is recommended that the plaintiff's motion for partial summary judgment on its right to limit its liability in accordance with the Limitation Act and to dismiss the claimant's demand for damages of lost future wages (Document No. 48) be denied.

Within thirteen (13) days after being served with a copy, any party may serve and file written objections to this Report and Recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,

s/ ROBERT C. MITCHELL
United States Magistrate Judge

Dated: May 9, 2007